## Fleming Appeal

*Howard Richard*, for appellant.

*Paul R. Sand*, for appellee.

DIGGINS, J., May 29, 1958.—Herbert Fleming, Lieutenant of Police for Upper Darby Township, was charged with neglect of duty by the Superintendent of Police, John J. Boyle, and at the same time suspended by the superintendent for a period of five days without pay. Lieutenant Fleming exercised his right to demand a hearing before a civil service commission which was accorded him, following which the civil service com-

mission sustained the charges preferred by the superintendent and affirmed the suspension. These charges concerned two emergency calls received by the Upper Darby Police Headquarters on April 29, 1957, while Lt. Fleming was in command.

The record shows that Sgt. Barry reported that on April 29, 1957, at 12:03 a.m., he received a call from Mrs. Sherry, 4007 Garrett Road, who requested that the police be sent to her home immediately as two strange young men had forced their way into her home, and the second report by Sgt. Barry on the same night was that at 12:07 he received a call from the Lansdowne Police to the effect that there was a request for the emergency car to go to 207 LaCarra Drive where a man was ill. The report says that the family physician was in attendance at the time.

When these two calls were received by the sergeant, Lt. Fleming was conducting roll call, which not only consists of a roll call, but is the time when the commanding officer briefs the incoming platoon on various matters of importance to be looked for and attended to during the tour of duty of the incoming platoon. Concededly, this is a very important function and always it has been attended to in this police department in a manner to command the attention of the listening platoon and in a serious and disciplined atmosphere.

On the night in question, Lt. Fleming appeared at the police station 50 minutes in advance of roll call, as was his custom, so that he could get from the outgoing lieutenant information needed for his roll call beginning at midnight. Three to five minutes after Lt. Fleming had begun his roll call, Lt. Belger, the outgoing officer, interupted the roll call to speak to Lt. Fleming. This was the first time in six years during which Fleming had been a lieutenant that his roll call was interrupted by another platoon leader. Great

stress was placed by Lt. Belger on the message he was delivering which forced the interruption, and he advised Lt. Fleming that he was handing him a directive from the superintendent of police which had to be read before every man in the platoon and that every man must understand it and that Lt. Fleming must submit a written report the following morning to the superintendent, advising him that this had been complied with.

It is important to note that Lt. Fleming did not know the contents of this directive before actually reading it aloud and while engaged then in briefing the platoon, Sgt. Barry again interrupted the roll call, giving Lt. Fleming a message that two teenagers were trying to crash a party. Again it is to be noted that this was the first time in the six years during which Lt. Fleming had been a lieutenant that a desk sergeant had ever interrupted. The customary procedure was for the desk sergeant either to speak to the platoon sergeant in the rear of the room without interrupting the roll call or to call down to the platoon whose shift ended at 12 midnight. It was the practice and the discipline in this police department required the outgoing shift to wait until the incoming shift's roll call had ended for the very purpose of being available for emergency calls during the transition.

A moment later, Sgt. Barry reappeared, again interrupting the roll call, to give Lt. Fleming a message about the hemorrhage case at LaCarra Drive. This message was given to him just as he was about to read the directive. Lt. Fleming was now confronted with the situation that if he permitted platoon officers to be dispatched in automobiles without these officers receiving the superintendent's directive at a roll call, he would be made to account for it, and under the procedure in force during the change of platoons, this would have been wrong, although it is conceded that from time to time the desk sergeant would quietly give

messages to the incoming platoon sergeant who might quietly dispatch men from the incoming platoon without interrupting the lieutenant's instructions. Lt. Fleming immediately recognized the position in which he had been put and as a consequence quickly read the letter from the superintendent and immediately dispatched two cars to the two addresses. *He did not wait until roll call was over before dispatching these cars.* In fact, the roll call lasted another five minutes.

The following day, Sgt. Barry made the critical reports which led to the five-day suspension without pay imposed by the superintendent of police and upheld by the civil service commission. An appeal was filed in this court and an extended hearing was held and all previous records were introduced.

We believe it to be the duty of a court to sustain the constituted authorities of a municipality wherever possible without doing injustice, and we concede the right of a municipality and its police superintendent to demand rigid discipline in its police force, and indeed we expect officers of the rank of Lt. Fleming to use superior judgment under the stress of emergency.

To understand this case, it must be borne in mind, and it is disclosed by the record, that there was in this police department tenseness which had been growing for a long period of time. There had been rumors of laxity in law enforcement and there had been dishonesty in the ranks, and there is a strong innuendo and undercurrent that Lt. Fleming, because of a strong stand against laxity in the force, had created enemies in the ranks. That there was laxity is borne out by the directive of the superintendent of police which was being read by Lt. Fleming under special instructions on the night in question. This had to do with an investigation then being conducted by the District Attorney's Office of Delaware County and other law enforcement agencies of the State "pertinent to the said investiga-

tion and relative to any probable wrongdoing of any member of the Police Department in connection with their official duty" etc.

Also, Sgt. Barry had been promoted to the rank of sergeant only a few weeks earlier over other men active in the Fraternal Order of Police. As a result, at the time a suit had been instituted to set aside this promotion as being improper and illegal. The suit was sponsored by the Fraternal Order of Police of which Lt. Fleming was president. In an effort to probe the question of bias, the court's attention was attracted to the lack of directness in Sgt. Barry's testimony in court, and this probe covers four pages of the record, the net result of which is that Lt. Fleming had directly charged bias to Sgt. Barry, and Sgt. Barry admitted a feeling but claimed it did not amount to sufficient bias as to cause him to give any testimony not wholly true.

One of the reasons for our probing this area, in addition to Lt. Fleming's charge of bias, was that our experience with police departments, as with most groups of men working together for a common purpose, has taught us that one does not ordinarily report another unless the exigencies and circumstances of a particular case require it, and it would not seem that, in the ordinary course of police business, these two events would have appeared as any more than routine reports of the calls received and the cars dispatched.

The fact that events proved both calls to be somewhat less than emergency has no bearing on the merits of this case except to point out that in the first call, it turned out that it arose from the fact that a couple of teenagers were crashing a party and in the second, or illness call, not only was the family physician in attendance when the call was received by the police, but was there when the police arrived, and had the police stand by for several minutes before their serv-

ices in taking the man to a hospital were required. As to whether or not, in any event, any unreasonable time was lost due to Lt. Fleming's having finished reading the directive before interrupting roll call to dispatch cars, we must look to the record.

The first call was received at 12:03 and the second call at 12:07. Lt. Fleming says the orders to dispatch the cars were given by him as soon as he finished reading the directive which, by a test in court, took about one minute and nine seconds. The police log and the record of the civil service hearing show that the police car reached the ill man at 12:21 and the police car reached the scene of the teenage intrusion at 12:26. The record shows that the driving distance to answer each of the calls was about the same, three to five minutes. Assuming it took two minutes for the policemen to reach their cars and five minutes to reach complainant's homes, subtracting these seven minutes from 12:21, we find the time would be 12:14 when they were dispatched, and there could readily have been, under these circumstances, more than two minutes elapsing before the police actually got in their cars. In any event, this would only be a nine-minute delay after the first call.

There is challenge to Sgt. Barry's placing the time of the second call at 12:07, because this call first came to the Lansdowne police, and their dispatcher reported that call reached the Upper Darby Police Station at 12:11 or 12:12, which would agree with Lt. Fleming's statement that he took time only to read the letter of the superintendent of police before dispatching the men. It would seem, therefore, that the reading of the letter to the contrary notwithstanding, the services rendered here were prompt enough.

It might well be said that this whole case is de minimus both as to the individual and to the municipality and that therefore the discipline should not be inter-

fered with. There is, however, more to this case. Lt. Fleming is an officer with an unblemished record of 35 years of service, and to taint this record, if undeserved, would be not only to work an injustice but to discourage other police officers. There is undoubtedly a principle here involved in addition to that of maintaining strict police discipline, and that is in seeing that discipline is not used improperly. It seems to us that the civil service commission based its opinion on an error in fact. The commission says that the emergency car in regard to the illness case was not *sent* until 12:21 whereas in point of fact the police car arrived at the scene at 12:21, and inasmuch as we are dealing here with minutes, if not split seconds, to sustain this penalty, this error has an important bearing.

Appellant questions the right of the superintendent of police to suspend an officer preliminarily as was done here. We think that section 20 of the Act of May 27, 1949, P. L. 1955, 53 PS §55645, provides authority for the suspension by the superintendent of police pending determination of charges. It is argued by appellant that since this act permits suspension by the police superintendent when the township commissioners are not in session, such a suspension is effective only until the next meeting of the commissioners and that their approval is required at the next meeting. There is such a provision in the Borough Code permitting the burgess to suspend but only until the next meeting of borough council, but it does not appear in the Township Code and therefore we are of the opinion that the superintendent of police acted within his authority in making the suspension. Indeed, we think such summary authority is necessary.

The civil service commission found "these two emergency cases were of such a nature as to require immediate attention" and the lieutenant's failure to do so left the commission no alternative but to sustain

the charge and find "Lt. Herbert Fleming neglected his duty and used poor judgment." We think the evidence does not sustain this finding and if it did, we would hesitate to substitute our judgment for the judgment of the civil service commission, however strongly we might feel about the justice of the result. This, however, is the type of case where we may substitute our judgment for that of the civil service commission. We may reach an independent conclusion from the record and the testimony taken before us: Reabe's Appeal, 59 D. & C. 586; Goehring's Appeal, 57 D. & C. 256.

We think that the facts disclosed by this record show that this officer acted with all due promptness under the circumstances and did not neglect his duty in either case. He was confronted with conflicting duties and he discharged each with the promptness that the circumstances required. This record is replete with discrepancies as to what the respective time lapses were. However, there seems to be agreement on the time when the cars arrived at their respective destinations.

It is to be borne in mind that not only did the civil service commission rely on an error of fact, but we had before us, as the act of assembly permits, much more testimony than did the civil service commission, and therefore, in the interests of justice to all parties concerned, the municipality, the police department and the individual officer, we think the decision of the civil service board must be reversed and we therefore make the following

## Order

And now, to wit, May 29, 1958, the order of the civil service commission of the Township of Upper Darby which is not dated but which finds that Lt. Herbert Fleming neglected his duty and used poor judgment,

thereby sustaining the penalty of five days' suspension without pay, be and the same is hereby reversed with the direction that the suspension be expunged from the record and the pay restored to appellant, Lt. Herbert Fleming.